AO 91 (Rev. 5/85) Criminal Complaint

**ORIGINAL**

FILED IN CHAMBERS
U.S.D.C. - Atlanta

AUG 0 6 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# United States District Court

### NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

SAUL ROMERO RUGERIO,
MIGUEL ANGEL RUGERIO and
ALONDRA LNU, also known as
CHRISTINA LNU

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**
~~UNDER SEAL~~

CASE NUMBER: 1:08-MJ-0883

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In or about May 2007, through on or about August 6, 2008, in Gwinnett County, in the Northern District of Georgia, and elsewhere, defendants, (Track Statutory Language of Offense)

**COUNT ONE**

Saul R. Rugerio and Miguel A. Rugerio, did, aided and abetted by each other, knowingly transport an individual in interstate and foreign commerce, with the intent that such individual engage in prostitution, in violation of Title 18, United States Code, Sections 2421and 2;

**COUNT TWO**

Saul R. Rugerio, Miguel A. Rugerio and Alondra LNU, also known as Christina LNU, did, aided and abetted by each other, knowingly and with reckless disregard of the fact that aliens have come to, entered and remained in the United States in violation of the law, harbor such aliens in a place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii), and Title 18, United States Code, Section 2; and

**COUNT THREE**

Saul R. Rugerio, Miguel A. Rugerio and Alondra LNU, also known as Christina LNU, did directly and indirectly, aided and abetted by each other, knowingly import an alien into the United States for the purpose of prostitution, in violation of Title 8, United States Code, Section 1328, and Title 18, United States Code, Section 2.

I further state that I am a Special Agent and that this complaint is based on the following facts:

SEE THE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof.          (X) Yes ( ) No

_Mary J. Mangrum_
Signature of Complainant
Mary J. Mangrum

Based upon this complaint, this Court finds that there is probable cause to believe that offenses have been committed and that the defendants committed them. Sworn to before me, and subscribed in my presence. I am further satisfied that for good cause shown the pleadings should be placed UNDER SEAL so as not to jeopardize an ongoing investigation.

August 6, 2008                          at      Atlanta, Georgia
Date                                            City and State

ALAN J. BAVERMAN
United States Magistrate Judge
Name and Title of Judicial Officer                    Signature of Judicial Officer
AUSA Richard S. Moultrie, Jr.

AFFIDAVIT

I, Mary J. Mangrum, being duly sworn, depose and state the following:

1. I am with the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed for 19 years. I am currently assigned to the Atlanta Division's Civil Rights Squad and am responsible for investigating crimes related to Human Sex Trafficking, Involuntary Servitude and Slavery, and Forced Labor. I have received training from the FBI and other organizations in the areas of Human Trafficking and Sex Trafficking.

2. I have been involved in seizures and investigations relating to victims who were threatened, forced, coerced and enticed into performing sex acts. I have participated in the execution of search warrants and seized evidence related to the offenses of Involuntary Servitude and Slavery, and Human Trafficking.

3. Those offenses involve violations of Title 18, United States Code, Sections 2421 (interstate transportation of an individual for illegal sexual activity), 2 (aiding and abetting), and Title 8, United States Code, Sections 1324 (illegal alien harboring and smuggling offenses) and 1328 (importation of illegal aliens for prostitution).

4. I make this affidavit in support of a complaint and arrest warrants charging SAUL ROMERO RUGERIO, MIGUEL ROMERO RUGERIO

AND ALONDRA LNU (Last Name Unknown), also known as "Christina" LNU, for violations of Title 18, United States Code, Sections 2421 and 2, and Title 8, United States Code, Sections 1324(a)(1)(A)(iii) and 1328. I also make this affidavit in support of warrants to search for evidence of these violations at the following locations: SOUTHERN WOODS APARTMENTS, 1286 Southern Woods Drive, Building 1385, Apartment G, Tucker, Georgia, 30084; LAKEVIEW ESTATES APARTMENTS, 6168 S. Norcross-Tucker Road, Building 1800, Apartment 1806, Atlanta, Georgia, 30084; STEEPLE CHASE APARTMENTS, 5940 Singleton Road, Building 5853, Apartment B, Norcross, Georgia, 30093; a 1996 green, Volkswagen Passat, bearing Georgia tag number AZV5205; a grey, Nissan Titan Truck, bearing Georgia Tag Number AYG8259; and a black, Volkswagen Jetta, bearing Georgia Tag Number ADH1704; all in Gwinnett County, Northern District of Georgia.[1]

5.    The facts and information outlined in this affidavit result from a joint investigation conducted by the FBI and Immigration and Customs Enforcement (ICE). The information in this affidavit is based upon my personal knowledge of the events set forth herein, and information provided to me by other law enforcement personnel, cooperating individuals and other sources of information. Due to this affidavit being submitted for the limited purposes of obtaining a complaint, and arrest and search warrants,

---

[1]The locations to be searched are more fully described below.

2

I do not include every fact known to me or other law enforcement personnel concerning this investigation, but set forth only those facts that I believe are necessary to establish probable cause.

I.
OVERVIEW OF THE INVESTIGATION

6. Based on my training and experience as a FBI agent, I am aware that human trafficking operations, involving prostitution, typically operate as follows:

A. Girls/women are smuggled into the United States for purposes of prostitution. These girls/women are smuggled by "traffickers" who reside in and outside the United States. For purposes of this affidavit, the term "trafficker" includes, but is not limited to, alien smugglers, human traffickers and any of their agents, brokers, employees and/or agents. These girls/women often are smuggled into the United States from and through foreign countries, including Mexico.

B. Some of these girls/women are initially lured into the United States by false promises of a legitimate job. The girls/women do not have the money to travel into the United States so they agree to be smuggled into the United States for a fee, or to work to repay the fees. Other girls/women are courted by traffickers and believe that they are in legitimate romantic relationships with these men. The girls/women agree to come to the United States with the traffickers in pursuance of the romantic

3

relationship, unaware that they are incurring a smuggling debt or that they will be forced to engaged in prostitution. The traffickers use a network of co-conspirators to arrange for the interstate and foreign transport of these girls/women. The girls/women are told they will make sufficient income to repay their smuggling fee in a small period of time.

C.   After the girls/women arrive in the United States they are compelled to repay the smuggling debt by working as prostitutes. Sometimes the traffickers house the girls/women at their residences to keep a close watch over them. At other times traffickers harbor the girls/women in other locations including, but not limited to, apartments or houses where the girls/women will not be discovered by law enforcement.

D.   Traffickers are known to maintain records of trafficking debts that are often recorded in books, notes, ledgers, "pay/owe" sheets and IOUs. They are also known to maintain large sums of cash, bank account records and records of money wires (international and domestic). Often such documentary evidence is written in a coded manner to conceal the illegal activity, and the traffickers often maintain these records in the form of handwritten notes. The funds often are, or contain, the proceeds of the trafficking activity including, but not limited to, debt payments and prostitution revenues. Traffickers often keep these records for an extended period of time, and these records document business

profits and expenses.   Traffickers also are known to maintain travel itineraries that relate to illegal activities including records of trips taken to recruit and obtain girls/women, and to transport funds and documents to various locations.

E.   It is routine for traffickers to hide the proceeds of their illegal activity in secure locations within their homes, apartments, businesses, storage facilities and vehicles.   The documents mentioned above are commonly maintained and concealed in these locations.   These records are also routinely maintained for extended periods.   This is especially true when illegal, human trafficking occurs over an extended period of time.

F.   Traffickers routinely maintain assets associated with their criminal activity such as vehicles, cellular telephones, bank accounts and real estate holdings, under fictitious names or under the names of other persons, such as relatives and/or associates, to avoid detection by law enforcement.  Despite the use of fictitious names, traffickers maintain control over these hidden assets. Additionally, traffickers often make travel arrangements under fictitious names or under the names of other persons, as described above, to avoid detection by law enforcement.

G.   Traffickers maintain address and/or telephone books listing names and/or clients of those involved in their criminal activity.   Often these names, addresses or telephone numbers are recorded in code.

5

H.  Traffickers frequently take, or cause to be taken, photographs of their residences, their property and the girls/women that they smuggle.  Traffickers maintain these photographs in their homes, businesses, storage facilities and vehicles.  These photographs often will depict the traffickers and the trafficked girls/women together.

I.  Traffickers are known to use cellular phones to communicate with their customers and co-conspirators.  These communication devices contain memory storage capabilities, including the storage of return telephone numbers and addresses that often belong to co-conspirators involved in the human trafficking, harboring, importation and transportation of aliens for prostitution.

J.  Routinely, traffickers maintain documents and/or indicia that is evidence of their occupancy or ownership of their residential and/or business premises.  The documents and indicia commonly are found on their person and in their residence.  Such documents include, but are not limited to, nominee banking records, foreign bank records, utility bills, rent receipts, pager/cellular phone receipts, rental/lease agreements, payment receipts, personal mail and other correspondence addressed to persons at the residence.

K.  Traffickers who maintain houses of prostitution often maintain custody of documents belonging to the girls/women working

6

as prostitutes, including identification documents, passports, and other travel-related documentation to prevent the girls/women from leaving on their own initiative. These documents typically are held in homes, businesses and/or safety deposit boxes. Because those who operate prostitution rings often change the location of their operations, their residences become a central location to maintain documents and evidence associated with the operation.

L. The trafficked girls/women often maintain personal letters and handwritten notes at the locations where they live and work, that are indicia of where they reside, and the activities in which they are engaged and with whom. For example, some girls/women working as prostitutes maintain their own customer records so that they reconcile with their traffickers' records.

M. Traffickers involved in the commercial sex trade often maintain items associated with that business wherever the girls/women work. They also regularly store these items off-site so the items will not be discovered during a police raid. Such items include, but are not limited to, contraceptives, condoms, lubricating gels, sex toys, lingerie, risqué clothing, pornographic videotapes, "pay/owe" sheets, laundry receipts, toiletries, hygiene products, tally sheets, and handwritten documents – such as receipts, bills and cancelled checks paid to other persons.

II.
FACTS ESTABLISHING PROBABLE CAUSE
TO SEARCH LOCATIONS AND ARREST SUBJECTS

A.   Case Initiation

7.   On November 27, 2007, a confidential source contacted the FBI and reported the following information about a group of Hispanic pimps operating in and around Atlanta, Georgia.

(A)   The source is employed as a driver in the Atlanta, Georgia, area, for pimps that smuggle illegal Hispanic females into the United States and thereafter cause them engage in prostitution.   The pimps are mostly natives of Mexico and Puerto Rico.   Several of the pimps are blood relations, but they all operate independently.   Each pimp uses two to three girls/women, whom he keeps separated in different apartments. The pimps do not generally allow the girls to leave their apartments during the day.   Rather, they must remain inside until it is time to go to work.

(B)   To avoid detection by law enforcement, the pimps do not drive the girls around at night.   Instead, the pimps hire drivers to pick up the girls/women each night and transport them to various locations to engage in prostitution.   The girls/women are typically forced to work at least six days a week and to perform sex acts with twenty to thirty men a night.   Many of the girls are compelled to engage in prostitution.   They are physically and sexually abused by

8

their pimps and their families are threatened with bodily harm or death.

(C)   The girls/women are warned to not talk with the drivers, the men that hire them or the police.   The pimps typically pay their drivers $100.00 to $150.00 per night.   The drivers collect monies earned by the girls/women throughout the night, and give it to the pimps when the drivers drop off the girls/women.   The pimps use different drivers each night to avoid relationships being formed between the drivers and the girls/women.

(D)   The source disclosed this information to law enforcement after the source discovered that his/her relative (Victim # 1) was transported to Atlanta, Georgia, from Mexico and forced to engage in prostitution for SAUL ROMERO RUGERIO (hereinafter referred to as "S. RUGERIO").   Prior to locating this relative who was forced into prostitution, the source had received a telephone call from family members in Mexico stating the  relative had run away with her new boyfriend and was taken to Atlanta, Georgia.

(E)   When the source encountered his/her relative in the course of his work as a driver, he/she helped the young woman escape from S. Rugerio and his associates.   The source's relative told the source that her "boyfriend" S. RUGERIO, who she met in Mexico, persuaded her to come with him to the

United States, and once she arrived, S. RUGERIO forced her to engage in prostitution for his profit.  The source said that he/she found his/her relative at the SOUTHERN WOODS APARTMENTS, Building 1385, Apartment G.[2]  This apartment complex is located at 1286 Southern Woods Drive, Tucker, Georgia, 30084.   The source said that when he/she went to get his/her niece from the apartment, a Hispanic male named "JORGE" opened the door.  The source knew Jorge to also be a pimp.

(F)  The source said that S. RUGERIO, his brother MIGUEL ANGEL RUGERIO (hereinafter referred to as "M. RUGERIO"), and JORGE reside and house women who work for them as prostitutes in are all associated with the SOUTHERN WOODS APARTMENTS where the source rescued his/her relative.   After the source recovered the relative, the source also learned that the relative's hometown friend was also smuggled into Atlanta, Georgia, by  M. RUGERIO, and forced by him to work as a prostitute.   The source was able to identify, locate and assist this female (Victim #3) to escape from M. RUGERIO.

8.  On March 23, 2008, while still acting as a driver for pimps in Atlanta, Georgia, the source met another young Hispanic female.  The female told the source that she was forced into

---

[2]While conducting physical surveillance of this apartment, FBI agents later determined that Apartment G is located at the rear, left side of Building 1385.

prostitution.  She said that she was physically abused and raped by S. RUGERIO while in Mexico, and that S. RUGERIO smuggled her into the United States and forced her to engage in prostitution once she arrived with him in Atlanta, Georgia.  The source subsequently rescued this female (described below as "Victim #2") and brought her to the Atlanta Office of the FBI to be interviewed.

B.   Statement of Victim #1

9.   On November 27, 2007, the FBI interviewed Victim #1.  She advised that in or around the spring of 2007, while she was only 17 years of age, she met S. RUGERIO, a Mexican national.   She met S. RUGERIO in her hometown in Mexico.  Victim #1 was in high school at the time and S. RUGERIO was living in Mexico with his brother, M. RUGERIO.

10.  Victim #1 began to date S. RUGERIO, and one of her high school friends (Victim #3) began to date M. RUGERIO.   S. RUGERIO knew that Victim #1 was only 17 years old when they started dating. After dating for about two months, S. RUGERIO asked the victim's parents for their permission to allow Victim #1 to leave with him and go to the United States.  He told the victim's family that he owned a business and could give Victim #1 a better life.

11.  Victim #1 said that S. RUGERIO initially treated her well and so her parents gave their permission for S. RUGERIO to take the victim to the United States.  Victim #1 had an infant whom she left

with her family.  She stopped going to school and traveled with S. RUGERIO to his hometown in Mexico.

12.  In or about August 2007, S. RUGERIO and Victim #1 traveled to Negales, Mexico, where they stayed for approximately two weeks.  S. RUGERIO then paid a "coyote" to help them illegally enter into the United States through the State of Arizona.[3]

13.  S. RUGERIO made all of the travel arrangements.  He told Victim #1 that once she found work in the United States she could pay him back for all of the traveling costs.  He never told her that she would be working as a prostitute.  Victim #1 was 18 years old when she arrived in the United States with S. RUGERIO.

14.  S. RUGERIO and Victim #1 traveled to Atlanta in various vehicles and stayed in various places along the way.   As they traveled, S. RUGERIO told Victim #1 not to talk to the people in the houses where they stayed or to the people with whom they traveled.  During this time, S. RUGERIO  spoke very harshly to the victim and she became afraid of him.  When they arrived in Atlanta, Georgia, Victim #1 was housed in an apartment by S. RUGERIO.  Two females named ALONDRA LNU AND LAURA LNU and a man named JORGE lived here as well.  Victim #1 later discovered that ALONDRA AND LAURA were prostitutes and JORGE was a pimp.

---

[3]"Coyote" is a common, Spanish term used to refer to persons that are paid to smuggle illegal aliens into the United States from Mexico.

15. According to Victim #1, JORGE was LAURA'S "husband" and LAURA worked as a prostitute for him. Additionally, ALONDRA'S real name is Christina, and that she was the wife of S. RUGERIO'S brother, M. RUGERIO. ALONDRA was approximately 26 years of age and LAURA was approximately 27 or 28 years old.

16. Victim #1 said that S. RUGERIO, the others and she were driven to an apartment where everyone lived. The apartment was located within the SOUTHERN WOODS APARTMENTS, located at 1286 Southern Woods Drive, Tucker, Georgia, 30084. The specific apartment was located in Building 1385, Apartment G.[4]

17. On Victim #1's first night in this apartment, despite being tired from the journey, she was not allowed to sleep. S. RUGERIO and the others took her shopping to buy more clothes. They bought her bras, panties, low-cut blouses, tight pants, short skirts and high heels. Victim #1 said that she did not understand why they were buying her these types of clothes. S. RUGERIO warned her not to ask questions. ALONDRA paid for all the clothes and S. RUGERIO told ALONDRA that Victim #1 would re-pay ALONDRA once the victim started to work.

18. S. RUGERIO then told Victim #1 that ALONDRA would explain to her the type of work that the victim would do. ALONDRA then

---

[4]The FBI, using a records database, determined that through February 2008, this apartment was listed in the name of "MIGUEL A. ROMERO", using a false social security number. This name combine's M. RUGERIO'S first name and middle initial, with S. RUGERIO'S middle name, Romero, as a last name.

said that Victim #1 and she would be working together and that the victim would be having sex with men. ALONDRA said that a man would come by the apartment to pick up Victim #1 and take her to places to have sex with men. ALONDRA told her that she must always use a condom and described the sexual positions that Victim #1 should use. ALONDRA told Victim #1 how to put the condoms on the men. She also told Victim #1 not to talk to anyone.

19. Victim #1 was shocked by what S. RUGERIO and ALONDRA told her. She told ALONDRA that she did not want to be a prostitute. She told S. RUGERIO that she would not have come with him to Atlanta, Georgia, if she knew she would be forced to engage in prostitution. S. RUGERIO told Victim #1 that she only had to prostitute long enough for S. RUGERIO to buy a car. He also words to the effect of, "You are with me now and you are going to do what I say." S. RUGERIO then threatened her, stating words to the effect, "You have to pay for your crossing, if you don't, your family will pay the consequences, starting with your baby." Victim #1 said that she began to cry, because she was afraid that S. RUGERIO would harm her family and her baby. S. RUGERIO bought big boxes of condoms and gave 25 of them to Victim #1 on her first night in Atlanta, Georgia. He told her that she must use them all.

20. That same night, ALONDRA called a male who came by the apartment to pick them up to take them to locations to engage in prostitution. Victim #1 cried as they were driven to several

14

houses.   Each time Victim #1 went into a room, the men would enter one at a time and be allowed to have sex with her for 15 minutes. The men were already present in the homes to which she was driven.

21.   Victim #1 was forced to have sex with approximately 20 men her first night.   The men paid the driver $25.00 to $30.00 dollars to have sex with her. Later she would see various drivers collect money and give it to S. RUGERIO at the end of each night. S. RUGERIO kept all of the money and gave none of it to Victim #1. He did give some money to ALONDRA.

22.   Victim #1 described how she was forced to have sex with about twenty-five men a night during the week, and about thirty men per night on the weekends.   She worked seven days a week, and was transported by different drivers.   S.  RUGERIO forced her to continue to work even when she was ill.   S. RUGERIO arranged for the drivers to transport her to the places where men paid to have sex with the victim, and she generally returned home each night after midnight.   S. RUGERIO physically beat her when she asked for money to send home to her family, and JORGE called her "ugly" and spoke badly about her daughter. S. RUGERIO ALSO threatened that he would call immigration police and Victim #1 would be put in jail.

23.   S.  RUGERIO gave Victim #1 a telephone to use for prostitution purposes.   Victim #1 did not remember her phone number, but maintained the phone contract.   On April 30, 2008, Victim #1 gave the FBI the contract for telephone number 678)887-

15

5253.  It is a Metro PCS phone issued to "JORGE GARCIA" (DOB: X/X/1972).  The contract was dated August 19, 2007.

24.  Victim #1 said that she was never left alone in the apartment.  There was constantly someone around her and she was not allowed to leave the apartment alone.

25.  One night when Victim #1 was required to engage in prostitution, the driver who picked her up from the apartment to driver her to clients turned out to be a relative from Mexico (the source).  The driver told her that her family contacted the driver from Mexico and asked the driver to find Victim #1.  The driver helped Victim #1 to escape from S. RUGERIO.  After she left, S. RUGERIO and his brother M. RUGERIO, kept calling the victim's mother in Mexico looking for her.

26.  During the time that Victim #1 was forced to work as a prostitute by S. RUGERIO and his associates, she was provided food, shelter and transportation by S. RUGERIO.

27.  On April 30, 2008, investigating agents showed Victim #1 several surveillance photographs taken of an Hispanic male whom the FBI saw  driving a green, Volkswagen Passat, bearing Georgia tag number AZV5205.  Investigating agents photographed the male in front of Building 1800 at the LAKEVIEW ESTATES APARTMENTS, 6168 S. Norcross-Tucker Road, Atlanta, Georgia, 30084.  Victim #1 recognized the male as M. RUGERIO.

28.   On May 7, 2008, FBI and ICE agents conducted surveillance at the SOUTHERN WOODS APARTMENTS, 1286 Southern Woods Drive, Building 1385, Tucker, Georgia, 30084.   An Hispanic male was seen walking down the stairs from the second floor and entering a grey, Nissan Titan.   He was with an Hispanic female.   Investigating agents took surveillance photographs and then showed them to Victim #1.   She then identified the male as M. RUGERIO and the female as ALONDRA.   Victim #1 also said that Apartment G was the one where she previously lived with S. RUGERIO, ALONDRA, JORGE and LAURA.

C.   Identification of Victim #2

29.   On March 23, 2008, the source told the FBI that he/she received a phone call from ALONDRA, who wanted a driver to pick up a girl from the LAKEVIEW ESTATE APARTMENTS, located at 6168 S. Norcross-Tucker Road, Building 1800, Atlanta, Georgia, 30084.   The source agreed to pick-up and transport the female (hereafter referred to as "Victim #2").

30.   Later that afternoon, the source arrived at Building 1800 of the LAKEVIEW ESTATES APARTMENTS, and called ALONDRA to let her know that he/she was outside waiting.   Shortly thereafter, a young looking Hispanic female exited the building and got into the source's vehicle.   The source described Victim #2 to be in her early 20's, and said that she looked very sad.   The source asked Victim #2 how she felt.   She told the source that she felt sick and

she started to cry.   The source told her that he/she could help her.

31.   Victim #2 told the source that she was from El Salvador, and that she was recently smuggled into Atlanta, Georgia, after leaving Mexico, by S. RUGERIO.   Victim #2 said S. RUGERIO forced her into prostitution and that she was afraid of him.   The source did not take Victim # 2 to locations to service clients, instead he gave her approximately $200.00 in cash, which was equivalent to the money she would have made engaging in prostitution to give to S. RUGERIO when she returned to his apartment at the end of the night. After several hours, the source returned Victim #2 back to S. RUGERIO'S apartment and she went inside with the money.   The source told Victim #2 that he/she would be back in the morning to pick her up and take her away from S. RUGERIO.

32.   On March 24, 2008, the source told the FBI that he arrived at the LAKEVIEW ESTATES APARTMENTS and parked in the vicinity of Building 1800.   Victim #2 came out of the rear, right side apartment of the second floor of the building, and got into the source's vehicle.[5]   The source drove her away from the complex. That day the source brought Victim #2 to the Atlanta Office of the FBI.

---

[5]Special Agent Charles Woodard of ICE visually confirmed that Apartment 1806 is the one located on the rear, right side of the second floor of Building 1800 at the LAKEVIEW ESTATES APARTMENTS.

18

D.   Statement of Victim #2

33.   On March 25, 2008, FBI agents interviewed Victim #2.  She advised that she was 22 years old and was from El Salvador.[6]  She said that in December 2007, her parents raised approximately $3,000.00 and paid a "coyote" for his assistance in getting their daughter to Atlanta, Georgia, where she would find work and live with family members.  Victim #2 left El Salvador with the "coyote" en route to the United States via Mexico.  Victim #2 was without any form of identification, other than her birth certificate, that the "coyote" kept in his possession.  She also carried a few clothes with her and $40.00 in cash.

34.   Once they arrived in Mexico, the "coyote" left the group in a plaza and did not return.  The victim was not aware of what city she was in or what she was going to do.  After nearly two hours, an Hispanic male walked up to Victim #2 and began talking to her.  He identified himself as "SAUL", whom she later knew as S. RUGERIO.  Victim #2 told S. RUGERIO that she was trying to get to Atlanta, Georgia, where her family members lived.   S. RUGERIO offered to help Victim #2 get to Atlanta, Georgia.  He also said that he could get her food and a job.  He told her that the job in Atlanta would pay well and that she would earn a lot of money.  He told her that she would have to pay him back for his assistance.

---

[6]FBI agents subsequently determined that Victim #2 was actually age 20 years, based on a review of her birth certificate.

19

35.   Victim #2 said that she accepted S. RUGERIO'S help and
left with him.  S. RUGERIO drove Victim #2 to an house in Mexico
which he said was his own.  He put Victim #2 in a bedroom on the
second floor and locked the door.  Approximately two hours later,
S. RUGERIO returned to the room and began making sexual advances
toward Victim #2.  When she tried to stop him he punched her in the
face and raped her.  She was a virgin at the time. She described
the rape as painful and stated that she bled.

36.   From this point, Victim #2 said that S. RUGERIO raped her
repeatedly at his house in Mexico and hit her often.   He also
threatened her family.  He told her that he had many contacts and
that they could kill her family members in Atlanta, Georgia.

37.   After approximately one month, S. RUGERIO told Victim #2
that it was time for them to leave, because her job in Atlanta,
Georgia, was ready.  Victim #2 said that the two left the house in
S. RUGERIO'S small, green car, and entered the United States
through a border crossing location that she could not identify.
After they crossed the border, they traveled by car to Atlanta,
Georgia.

38.   After arriving in Atlanta, Georgia, S. RUGERIO took
Victim #2 to an apartment.   Another girl was present in the
apartment.  She appeared to be about 17 years of age.  Victim #2
described the girl as skinny with marks on her body.   She was
referred to as "la nina" (the girl) and the victim was not allowed

to talk to her.   S. RUGERIO told Victim #2 that "la nina" was one of her co-workers and that the two would be working together.

39.   S. RUGERIO gave Victim #2 a bedroom, which he locked her in. S. RUGERIO told Victim #2 that he was keeping her locked up because the police and/or immigration agents would be able to see her inside the apartment if she was walking around.

40.   Victim #2 said that "la nina" was  also locked in a bedroom.  Victim #2 also described another female at the apartment called "ALONDRA".  Victim #2 said that ALONDRA was approximately 27 or 28 years old.   ALONDRA told the victim that they too would be working together.   S. RUGERIO told Victim #2 that ALONDRA would show her how to work, but he did not describe the type of work.

41.   Victim #2 said that S. RUGERIO kept her locked in the bedroom for about two weeks before forcing her to engage in prostitution.   During this time, S. RUGERIO did not allow her to call members of her family.   Also S. RUGERIO forced the victim to have sex with him in the apartment.   Each time she refused to have sex with S. RUGERIO, he hit her.   One time he hit her in the back with a gun.   Victim #2 said that S. RUGERIO always carried a gun with him.

42.   On or about March 21, 2008, Victim #2 recalled that S. RUGERIO drove her in his green car to ALONDRA.   Next, he drove Victim #2 and ALONDRA to a third apartment.   Inside the apartment,

Victim #2 saw five or six other girls and approximately four or five men.  The girls appeared younger than Victim #2, and looked to be between the ages of 13 and 17 years.  They were all Hispanic and were dressed in mini-skirts and short tops.

43.  Victim #2 said that she then realized that S. RUGERIO meant to force her into prostitution.  S. RUGERIO gave Victim #2 approximately 20 condoms and told her to use them each time she had sex.  He told her that ALONDRA would show her how to put the condoms on the men.  ALONDRA told Victim #2 that ALONDRA and she were going into the bedroom to work.  Victim #2 told ALONDRA that she could not do that type of work.  Victim #2 explained that she was never told that should have to perform prostitution.  ALONDRA then screamed at Victim #2 and told her that she had to do it. ALONDRA told Victim #2 that she must have sex with men because Victim #2 was in the United States illegally.  ALONDRA threatened to call immigration officers to report Victim #2.

44.  Victim #2 was forced to engage in sex with approximately six to ten men her first night of work.  At the end of the night, S. RUGERIO returned Victim #2 to RUGERIO'S apartment and locked her in the same bedroom.  He did not pay Victim #2 any money and told her that she would not get paid while she was in "training".

45.  On March 23, 2008, Victim #2 said that a driver (the source) arrived at the apartment to pick her up.  The driver asked

how she felt, because she was crying once she got into the driver's car.  This was the first occasion that S. RUGERIO had not accompanied Victim #2 when she was forced to go to a location to perform prostitution.  Victim #2 told the driver that she was not feeling well.  She told the driver about her family and what S. RUGERIO had done to her.  Victim #2 said that the driver was very nice and offered to help.  Instead of taking Victim #2 where she was scheduled to meet men that night, the driver gave her $225.00 and told her to give the money to S. RUGERIO.  The driver returned her to the apartment later that night and told her that he/she would return in the morning to pick her up.

46.  On March 24, 2008, the driver returned to the apartment and helped Victim #2 to escape.   The driver gave Victim #2 a telephone so that she could call her mother.  On the following day, March 25, 2008, Victim #2 said that the driver brought her to the Atlanta Office of the FBI.

47.  While Victim #2 was forced to engage in prostitution by S. RUGERIO, she was provided with food, shelter and transportation by S. RUGERIO and his associates.

E.  <u>RUBI LNU</u>

48.  On March 27, 2008, a FBI source received a telephone call from a female who identified herself as "RUBI" LNU, using cell phone number (678)558-6632.  The FBI conducted a database records

check and learned that this cell phone number is subscribed to "MIGUEL A. ROMERO" — the same person in whose name Apartment G at the SOUTHERN WOODS APARTMENTS, described above, was listed. The source reported that RUBI called the source to make arrangements for the source to pick her up on March 27, 2008, at the LAKEVIEW ESTATES APARTMENTS, Building 1800, Apartment 1806, 6168 S. Norcross-Tucker Road, Atlanta, Georgia 30084.

49. While conducting surveillance, agents saw the source arrive in front of Building 1800 at approximately 6:38 p.m. The source called RUBI to let her know that he/she was parked outside. When RUBI answered her phone, the source said that he/she heard male voices inside the apartment. Agents then saw a short, young looking Hispanic female leave Building 1800 and getting into the source's vehicle. The female told the source that her name was RUBI. While the source was alone with RUBI in the car, the source asked her about Victim #2, who the source had recently picked up from the same apartment. RUBI said that Victim #2 was no longer living in the apartment and that S. RUGERIO told RUBI that Victim #2 was sick and in the hospital. The source drove RUBI to several different locations where she engaged in prostitution. At the end of the night, the source returned RUBI to the same apartment at the LAKEVIEW ESTATES APARTMENTS.

50.  On May 12, 2008, the source received another phone call from RUBI.  She told the source that she recently changed her telephone number, and gave him/her a telephone number of (404)428-6964. FBI agents subsequently learned that this number is also subscribed to "MIGUEL A. ROMERO".

F.  <u>JENNY LNU</u>

51.  On July 9, 2008, a source received a telephone call from a female who identified herself as "JENNY".   JENNY called the source to arrange for a ride to the STEEPLE CHASE APARTMENTS located at 5940 Singleton Road, Norcross, Georgia, 30093.  At approximately 6:30 p.m., the source picked JENNY up from the STEEPLE CHASE APARTMENTS in the vicinity of Building 5853.  As the source was waiting for JENNY, the source recognized a grey, Nissan Titan truck in the parking lot.  The source knew that S. RUGERIO'S brother, M. RUGERIO, drove the vehicle.  When JENNY got into the source's car, the source pointed to the vehicle and asked JENNY if M. RUGERIO still drove the grey, Nissan truck.  JENNY answered,"Yes, that's MIGUEL'S truck."

52.  On July 10, 2008, the source was shown several surveillance photographs taken of an unknown Hispanic female who agents previously saw on June 3, 2008, come out of Building 5853 of the STEEPLE CHASE APARTMENTS while accompanied by M. RUGERIO.  The source positively identified the girl in the photographs as JENNY.

25

G.   Statement of Victim #3

53.   On July 30, 2008, a source reported to the FBI that he met Victim #3.   The source brought Victim #3 on that same date to the Atlanta FBI Office to be interviewed by FBI and ICE agents. Victim #3 said she is a citizen of Mexico, age 18 years.   Victim #3 reported that in or about May 2007, she met M. RUGERIO, a Mexican national, through a friend.   Victim #3 was then in high school and only 17 years old.   M. RUGERIO told Victim #3 that he was 25 years old.   After knowing Victim #3 for two days, M. RUGERIO invited her to his home to see his house and to meet his father.   Victim #3 agreed to go.

54.   Victim #3 discovered that there were two houses on the property where M. RUGERIO drove her - one that belonged to M. RUGERIO'S brother, "SAUL", and the other one that was owned by  M. RUGERIO.   Victim #3 said that M. RUGERIO and his family did not treat her well, and after four days, she told M. RUGERIO that she wished to return home.   M. RUGERIO told Victim #3 that she must stay with him, because he said that Victim #3 was his "wife."

55.   Victim #3's mother talked to M. RUGERIO, after which he allowed the victim to return home for a few days to attend her sister's birthday party on June 30, 2007.   However, shortly thereafter he bought Victim #3 a round trip bus ticket and warned

26

her to return or that he would come and get her.   Victim #3
returned to M. RUGERIO after three days.

56.   M. RUGERIO forced Victim #3 to stay with him until in or
about September 2007.   During this time, he forced Victim #3 to
engage in sex acts with him and slapped her in the face on one
occasion when she refused.   On that occasion, he locked Victim #3
in a room for a day without food or water.

57.   In or around September 2007, M. RUGERIO sent Victim #3 to
Atlanta, Georgia, alone.   He told her that she was going to
Atlanta, Georgia, to work.   M. RUGERIO did not tell her what type
of work she would be doing.   M. RUGERIO flew Victim #3 to Mexico
City and then arranged for a "coyote" to smuggle her into the
United States through the State of Arizona.   When she arrived in
Atlanta, Georgia, the "coyote" called a female named "ALONDRA".
ALONDRA picked Victim #3 up in a taxi and took her back to her
apartment.   ALONDRA was accompanied by two other people, "JORGE"
and "LAURA".    ALONDRA introduced them to Victim #3 as her
"friends".

58.   Victim #3 said that the apartment was located near Jimmy
Carter Boulevard, and that the complex was called SOUTHERN WOODS
APARTMENTS.   She recalled that the building had the letter "G"
printed on it.   Once inside the apartment, ALONDRA took out a bag
of condoms and told the victim that a guy was going to be coming to

the apartment to pick her up and take her to work.   ALONDRA then told Victim #3 that she would be having sex with men. Victim #3 told ALONDRA that she did not want to do that type of work. ALONDRA then threatened to telephone M. RUGERIO in Mexico if Victim #3 refused to do as ALONDRA told her to do.

59.  On her first night at the apartment, a driver took Victim #3 to several locations where she was coerced  to engage in sex acts with approximately twenty men.   The men paid the driver between $25.00 and $30.00 dollars to have sex with Victim #3.   At the end of the night, the driver kept $15.00 per customer and gave the rest of the money to Victim #3.   The driver then returned her to ALONDRA'S apartment.   Victim #3 then gave the money to ALONDRA. ALONDRA told Victim #3 that she must re-pay ALONDRA for clothing expenses.   M. RUGERIO told Victim #3 that the money she earned would be used by him to re-pay her smuggling fees.

60.  Victim #3 was able to escape from ALONDRA'S apartment after one of her driver's turned out to be related to Victim #1 (described above).  Victim #1 and Victim #3 were childhood friends. Victim #3 said that the driver, helped her to escape at the end of October 2007, or in early November 2007.  After her escape, Victim #3 heard that M. RUGERIO, ALONDRA, JORGE, LAURA and a new girl M. RUGERIO transported to Atlanta, Georgia, from MEXICO, were living in an apartment at the LAKEVIEW ESTATES APARTMENTS.

61. The FBI showed Victim #3 a surveillance photograph taken on May 7, 2008, depicting an Hispanic male and female. Investigating agents saw these individuals leaving Building 1385 at the SOUTHERN WOODS APARTMENTS. Victim #3 identified the man and woman as M. RUGERIO and ALONDRA. On this same date, Victim #3 identified S. RUGERIO from an immigration photograph dated October 25, 2005.

H.   Immigration Checks

62. There are no records of lawful entry for Victims #1, #2, or #3. Additionally, there are no records of lawful entry for S. RUGERIO or M. RUGERIO.

I.   Physical Surveillance

63. On January 18, 2008, FBI agents conducted surveillance at SOUTHERN WOODS APARTMENTS, 1286 Southern Woods Drive, Building 1385, Apartment G, Tucker, Georgia, 30084. FBI agents at that time saw a green, Volkswagen Passat parked in front of the apartment building bearing Georgia tag number AZV5205. Also on January 18, 2008, the FBI conducted a National Crime Information Center (NCIC) inquiry regarding this vehicle and learned that it is registered in the name of "Carmelo Reyes Painting, Inc.", located at 3515 Pleasantdale Road, Apartment 242, Doraville, Georgia. The source, described above, previously told the FBI that this vehicle is driven by S. RUGERIO and M. RUGERIO. At approximately 5:20 p.m. on

29

this same date, an Hispanic male later identified by the source and Victim #1 as M. RUGERIO, was seen by FBI agents leaving Building 1385 of the SOUTHERN WOOD APARTMENTS and driving away in the green, Volkswagen Passat.

64.   At approximately 6:00 p.m. on January 18, 2008, FBI agents saw a black, Honda Civic, bearing Georgia tag number BQ05FZ, park in front of Building 1385 of the SOUTHERN WOODS APARTMENTS. An Hispanic female, who was later identified as ALONDRA by Victim #1, left the same apartment building, and entered the black, Honda Civic.   ALONDRA traveled to a house located at 175 Cochran Road, Marietta, Georgia.   ALONDRA entered the home, and FBI agents conducting surveillance watched as several Hispanic males arrived at and left the house.

65.   On March 26, 2008, FBI agents conducted surveillance at the LAKEVIEW ESTATES APARTMENTS, 6168 S. Norcross-Tucker Road, Building 1800, Apartment 1806, Atlanta, Georgia, 30084.   At approximately 4:30 p.m., a green, Honda Accord pulled in front of Building 1800.   FBI agents saw a short, Hispanic female with dark hair walk down the stairs from the second floor of the building. She appeared to be approximately 16 or 17 years of age.   She walked over to the Honda Accord and entered it.   The vehicle then left the apartment complex.   FBI agents subsequently identified the Hispanic woman as RUBI, described above.

66. On March 27, 2008, the source received a telephone call from RUBI at the LAKEVIEW ESTATES APARTMENT requesting a driver for that evening. FBI agents conducting surveillance at the apartment complex saw the source arrive in front of Building 1800 at approximately 6:38 p.m. and pick up RUBI. The source reported that he/she drove RUBI to several different locations where she engaged in prostitution that night.

67. On April 3, 2008, while conducting surveillance at LAKEVIEW ESTATES APARTMENTS, FBI and ICE agents saw S. RUGERIO'S green Volkswagen Passat bearing Georgia tag number AZV5205, parked in front of Building 1800. At approximately 6:18 p.m., FBI and ICE agents also saw a yellow, Nissan Frontier bearing Georgia tag number 7971ALK, arrive in front of Building 1800. It was driven by an Hispanic male. FBI agents watched as an Hispanic female left the rear, right apartment on the second floor, walked down the stairs and entered the vehicle. The car then left the apartment complex. At approximately 6:52 p.m., a silver, Honda Civic bearing Georgia tag number AAA3331, pulled in front of Building 1800, and an Hispanic female, previously identified as RUBI, also left the rear, right apartment on the second floor and entered the same silver, Honda Civic. The car then left the area. Finally, at approximately 6:53 p.m., M. RUGERIO also walked out of the apartment located on the second floor, and rear, right side of the

same building, and entered the green, Volkswagen Passat bearing Georgia tag number AZV5205.  He then left the LAKEVIEW ESTATES APARTMENTS and drove to the STEEPLECHASE APARTMENTS, located at 5940 Singleton Road, Norcross, Georgia, 30093.  He entered Building 5853.

68.  On April 8, 2008, while conducting surveillance at the LAKEVIEW ESTATES APARTMENTS, FBI agents saw a green Volkswagen Passat bearing Georgia tag number AZV5205, parked in front of Building 1800 at approximately 5:13 p.m.  At approximately 6:37 p.m., an Hispanic male matching the description of M. RUGERIO given by the source and Victim #1, walked down the stairs from the second floor of Building 1800, entered the green, Volkswagen Passat and drove away.

69.  On this same date, at approximately 6:41 p.m., FBI agents watched as a gold Mitsubishi, bearing Georgia wildlife tag number WX87A9, pulled in front of Building 1800 of the LAKEVIEW ESTATES APARTMENTS.  Shortly thereafter, RUBI walked down the stairs from the second floor and entered the gold Mitsubishi.  The vehicle then departed the area.

70.  On April 22, 2008, while conducting surveillance at the LAKEVIEW ESTATES APARTMENTS,  ICE agents saw M. RUGERIO park the green Volkswagen Passat, bearing Georgia tag number AZV5202, in front of Building 1800 at approximately 6:00 p.m.  M. RUGERIO

walked up the stairwell and went towards the rear, right side apartment. At approximately 6:12 p.m., M. RUGERIO and RUBI walked down the stairs and entered the green Volkswagen Passat. M. RUGERIO drove the vehicle to a nearby park and jogged around a track while RUBI walked around it.

71. On May 7, 2008, while conducting surveillance at the SOUTHERN WOODS APARTMENTS, located at 1286 Southern Woods Drive, Building 1385, Apartment G, Tucker, Georgia, FBI and ICE agents saw an Hispanic male in a new, grey, Nissan Titan truck, park in front of Building 1385 at approximately 9:00 a.m.[7] At the time, the truck bore only a new, dealer drive-out tag. However, while conducting surveillance on July 31, 2008, agents saw that the truck bore Georgia tag number AYG8259. A NCIC inquiry revealed that the tag is actually registered to a 2003, Hyundai Sante Fe'.

72. The agents recognized the Hispanic male driving the grey, Nissa truck on May 7, 2008, as M. RUGERIO. M. RUGERIO entered an apartment at Building 1385 of the SOUTHERN WOODS APARTMENTS. At approximately 11:00 a.m., M. RUGERIO returned to the grey, Nissan truck with an Hispanic female. They drove to the Tanger Outlet Mall in Commerce, Georgia, and shopped. At approximately 1:55 p.m., M. RUGERIO and the female returned to the SOUTHERN WOODS

---

[7]On June 3, 2008, victim JENNY told the driver/source that this truck belonged to "Miguel" (M. RUGERIO) (as described in Section F of the affidavit, above).

APARTMENT complex.  M. RUGERIO dropped the female off in front of the stairwell for Building 1385.  The female then walked up the stairwell of the apartments to the second floor towards Apartment G.

73.  Agents watched as M. RUGERIO then drove to the LAKEVIEW ESTATES APARTMENTS located at 6168 S. Norcross-Tucker Road, Atlanta, Georgia, 30084.  He drove to the back of the apartment complex and parked in front of Building 1800.  After parking, he walked up the stairwell to Building 1800 and walking toward the rear, right apartment.  At approximately 2:43 p.m., M. RUGERIO drove back to the SOUTHERN WOODS APARTMENTS, parked at Building 1385, and walked up the stairwell toward the rear, left apartment. At approximately 3:05 p.m., M. RUGERIO returned to his vehicle and drove back to the LAKEVIEW ESTATES APARTMENT complex, Building 1800.

74.  On this same date, at approximately 3:30 p.m., agents followed M. RUGERIO to the STEEPLE CHASE APARTMENTS, located at 5940 Singleton Road, Norcross, Georgia, 30093.  He parked his vehicle in front of Building 5853.  He walked toward the rear, left side of the building toward the lower, left apartment.  ICE agents surveilled the lower, left apartment located at the rear, left side of Building 5853, and confirmed that it is Apartment B. Agents then saw M. RUGERIO drive away from the STEEPLE CHASE APARTMENTS and go

34

to the SHADOW LAKE APARTMENTS, located at 3515 Pleasantdale Road in Doraville, Georgia.   There, M. RUGERIO drove to Building 6 of the apartment complex, where he picked up two Hispanic male passengers and drove them to Building 5853 of the STEEPLE CHASE APARTMENTS.

75.   Later, on May 7, 2008, FBI agents continued to surveill Apartment 1806 at the LAKEVIEW ESTATES APARTMENTS.   While doing so, they saw a grey, Toyota Camry pull in front of Building 1800 as an Hispanic female walked down the stairs from the direction of Apartment 1806, and entered the car.   The driver of the Toyota Camry then immediately left the apartment complex.

76.   On May 30, 2008, ICE agents conducted surveillance at the SOUTHERN  WOODS  APARTMENTS,  Building  1385,  Apartment  G.   At approximately 7:10 p.m., an unknown Hispanic female walked down the stairwell from the rear, left side apartment.   The female appeared to be approximately 19 to 21 years of age and looked frightened. The female entered a grey, Ford Escape bearing Georgia tag number ADJ6006.   The vehicle then drove off.   At approximately 7:42 p.m., agents saw M. RUGERIO park the green, Volkswagen Passat in front of Building 1385.   M. RUGERIO got out of the car and walked up the stairwell toward the rear left apartment.   At approximately 7:51 p.m., M. RUGERIO left the apartment and drove away.

77.   On June 3, 2008, ICE agents conducted surveillance at the STEEPLE CHASE APARTMENTS, Building 5853, Apartment B, located at

35

5940 Singleton Road, Norcross, Georgia, 30093.  At approximately 6:03 p.m., M. RUGERIO drove up to the apartment building in the green, Volkswagen Passat and parked in front of Building 5853.  He then walked towards Apartment B – the rear, lower left apartment. At approximately 6:07 p.m., M. RUGERIO walked from Apartment B with an unknown Hispanic female.   The female appeared to be approximately 18 to 21 years of age.   Both M. RUGERIO and the female walked to the green, Volkswagen Passat and entered it.  They drove to a nearby Laundromat and shortly thereafter, returned to the STEEPLE CHASE APARTMENTS.

78.  On June 23, 2008, investigating agents conducted surveillance at the SOUTHERN WOODS APARTMENTS and at the STEEPLECHASE APARTMENTS.  At 5:17 p.m., a green Volkswagen Passat, bearing Georgia tag number AZV5205, parked in front of Building 1385.  At about 6:16 p.m., the green, Volkswagen Passat pulled into the parking lot of the STEEPLE CHASE APARTMENTS.  M. RUGERIO left the vehicle and walked towards Building 5853.  At approximately 7:24 p.m., a green, Toyota Tacoma pick-up truck, bearing Georgia tag number AWQ1930, pulled in front of Building 5853.  The male driver was observed talking on his cell phone.  He appeared to be looking for someone.  An unknown Hispanic female then walked from Apartment B of Building 5853.  Agents recognized her as the same unknown, Hispanic female seen by them with M. RUGERIO at the

36

STEEPLE CHASE APARTMENTS on June 3, 2008, as described above. Agents then saw M. RUGERIO standing in the breeze way of the building talking to the female. He too was using a cell phone. The Hispanic female gave something to M. RUGERIO and then entered the green, Tacoma truck. The vehicle then drove away. M. RUGERIO then immediately departed the apartment complex.

79. On July 10, 2008, FBI and ICE agents conducted surveillance at the SOUTHERN WOODS APARTMENTS, Building 1385, Apartment G, located at 1286 Southern Woods Drive, Tucker, Georgia, 30084. At approximately 5:17 p.m., a green, Volkswagen Passat, bearing Georgia tag number AZV5205, parked in front of Building 1385. Agents saw three Hispanic males standing in front of the vehicle, one of whom they recognized as M. RUGERIO. Another of the males matched the physical description of S. RUGERIO. The agents did not recognize the third Hispanic male. M. RUGERIO and the unknown Hispanic male left the apartment in a black, Plymouth Neon bearing Georgia tag number BCU6625.

80. On the same date, at approximately 7:20 p.m., investigating agents conducting surveillance at the LAKEVIEW ESTATES APARTMENTS, 6168 S. Norcross-Tucker Road, Tucker, Georgia, 30084, saw a black, Volkswagen Jetta, bearing Georgia tag number ADH1704, pulled up to Building 1800. Investigating agents learned that the vehicle is registered to "Rafael Otero Sanchez". M.

37

RUGERIO, driving the car, and an Hispanic passenger that the agents recognized as RUBI, got out of the vehicle and walked up the stairwell of Building 1800.  M. RUGERIO and RUBI then left the apartment and drove to a nearby strip mall.  There, M. RUGERIO and RUBI met an unknown Hispanic male.  Two Hispanic females got out of the Hispanic male's car and entered M. RUGERIO'S vehicle.  M. RUGERIO drove the females to a gas station, where he parked his car.  The agents surveilling him saw him talking on a cell phone. Approximately 30 minutes later, an unknown Hispanic male pulled up in a car beside M. RUGERIO'S vehicle.  One of the three females in M. RUGERIO'S vehicle then got into the car driven by the unknown, Hispanic male, and the car left the station.  M. RUGERIO and the two remaining Hispanic females returned, in the car driven by M. RUGERIO, to the LAKEVIEW ESTATES APARTMENTS.

81.  On July 31, 2008, investigating agents conducted surveillance at the Southern Woods Apartments, Building 1385, 1286 Southern Woods Drive, Tucker, Georgia 30084.  At approximately 6:10 p.m., an Hispanic female, who appeared to be in her late teens or early twenties, walked from Building 1385 and entered a blue, Chevy Lumina.  The vehicle was driven by an older, Hispanic male.  The Hispanic male left the apartment complex and drove to Gainesville, Georgia.  Agents watched as the driver took the Hispanic female to to four private residences.  At each location, the female got out

of the vehicle, entered the house residence, and remained inside for approximately 15 to 30 minutes. The agents saw the Hispanic driver smoking while he waited outside of the residences. The agents terminated surveillance after the female entered the fourth house.

### III.
### LOCATIONS TO BE SEARCHED

82. SOUTHERN WOODS APARTMENTS, 1286 Southern Woods Drive, Building 1385, Apartment G, is located in Tucker, Georgia. Building 1385 is the last building on the right when entering the complex. In the center of building 1385 is located a stairwell. Building 1385 is beige, with vinyl siding and green shutters along the windows. When facing Building 1385, there is a green sign to the left of the stairwell that contains the numbers "1-3-8-5", painted in white. Upstairs, on the rear, left side of the building, is Apartment G. The letter "G" is posted on the door.

83. LAKEVIEW ESTATES APARTMENTS, 6168 S. Norcross-Tucker Road, Building 1800, Apartment 1806, is located in Atlanta, Georgia. Building 1800 is located in the far, rear, right side of the apartment complex. In the center of building 1800 is located a stairwell. Building 1800 is light brown/beige in color, with a slightly darker brown/beige wood trim. Upstairs, at the rear, right side of the building, is Apartment 1806. The apartment numbers are posted on a brown sign, and the numbers are white in

color.   The sign containing number, "1-8-0-6", is posted next to the door of the apartment.

84.   STEEPLE CHASE APARTMENTS, 5940 Singleton Road, Building 5853, Apartment B, is located in Norcross, Georgia.   Building 5853 is located at the far, left side of the complex from the main entrance.   Building 5853 is made of brown, wood exterior and has two floors.   When facing the building, there is a green sign with white letters that display the numbers, "5-8-5-3".   Underneath those numbers appear the letters, "A-B" and "C-D".   When facing the building, the main entrance to Apartment B is located at the rear, left side of the building and around the corner from Apartment A. The letter "B" is posted on the door of the apartment.   There is a fire hydrant painted silver and metallic, with the number "5" painted on the lower part of it.

IV.
SUBJECTS TO BE SEIZED

85. The following subjects are to be seized and are depicted in the photographs attached hereto as Exhibits "A", "B", and "C", respectively:

A.   SAUL ROMERO RUGERIO ("S. RUGERIO");

B.   MIGUEL ROMERO RUGERIO ("M. RUGERIO"); and

C.   ALONDRA LNU, also known as CHRISTINA LNU ("ALONDRA".

V.

<u>ITEMS TO BE SEARCHED AND SEIZED</u>

86.   The items to be seized are evidence of violations of Title 18, United States Code, Sections 2421, and 2, and Title 8, United States Code, Sections 1324 and 1328, specifically:

A.   Female aliens, foreign nationals and other non-United States citizens who are illegal aliens or otherwise unlawfully in the United States;

B.   Documents relating to smuggling contracts, fees owed or paid by or on behalf of illegal aliens.   "Documents" in this context include original books of entry, general journal ledgers, cash receipts, credit card receipts and cash receipt notes.

C.   Identification documents and copies of identification documents, including drivers' licenses, social security cards, passports, resident alien cards, employment authorization cards and foreign identification cards.

D.   Travel receipts, tickets and vouchers.

E.   Letters, postcards, audio cassette tapes, and other correspondence containing communications by or to the target subjects and/or smuggled aliens.

F.   Personal items and effects, travel bags, duffel bags, suitcases, and other items used to carry personal property – such as clothing items belonging to smuggled aliens.

41

G.   Bank   statements,   checks,   deposit   tickets,   check registers, credit card receipts, invoices, money orders, travelers checks,  and  cashier  checks  showing  receipt  or  distribution  of profits from smuggling, prostitution and harboring activities.

H.   Address   books,   customer   lists,   telephone   notes, appointment books and calendars.

I.   Lists of aliens smuggled into the United States.

J.   Travel documents, in the form of passports or identity documents.

K.   Money   grams,   checks,   money   transfer   records,   money orders, or other forms of payment relating to harboring, smuggling and prostitution activities.

L.   Any documentation tending to prove the owner or person in control of the premises searched, such as mail, phone bills and other  utility  bills  and  receipts,  loan  documents,  records  of ownership, leases and bill paying records.

M.   United States currency in any amount over $500.00.

N.   Any photographs, videotapes and/or audiotapes that depict the smuggling of aliens.

O.   Photographs, magazines and videotapes depicting images of sexual  activity  with  a  minor,  commercial  sexual  activity, prostitution or pimping.

42

P.   Any aids, devices, tools, supplies or materials used to engage in sexual acts, including condoms, lubricants, restraints, props, lingerie, or risqué clothing.

Q.   Receipts reflecting the purchase of condoms, lubricants and other sexual aids and devices.

R.   Payment records, ledgers and tally sheets reflecting prostitution, harboring and/or smuggling activities.

S.   Cellular telephones and electronic pager devices, or documents related to cellular telephone and electronic device subscriber information.

T.   A Green, Volkswagen Passat, bearing Georgia Tag Number AZV5205.

U.   A Grey, Nissan Titan Truck, bearing Georgia Tag Number AYG8259.

V.   A Black, Volkswagen Jetta, bearing Georgia Tag Number ADH1704.

VI.
CONCLUSION

87.  Based on the facts set forth in this affidavit, and upon our experience and training, we believe that there is probable cause to believe that SAUL ROMERO RUGERIO ("S. RUGERIO"), MIGUEL ROMERO RUGERIO ("M. RUGERIO") and ALONDRA LNU, also known as "Christina" LNU ("ALONDRA"), committed the following violations:

43

a.    S. RUGERIO and M. RUGERIO did, aided and abetted by each other, knowingly transport an individual in interstate and foreign commerce with intent that such individual engage in prostitution, in violation of Title 18, United States Code, Sections 2421 and 2;

b.    S. RUGERIO, M. RUGERIO and ALONDRA LNU, did, knowing and with reckless disregard of the fact that aliens have come to, entered and remained in the United States in violation of the law, harbor such aliens in a place, in violation of Title 8, United States Code, Section 1324 (a)(1)(A)(iii), and Title 18, United States Code, Section 2; and

c.    S. RUGERIO, M. RUGERIO and ALONDRA LNU, did directly and indirectly import illegal aliens into the United States for prostitution, in violation of Title 8, United States Code, Section 1328, and Title 18, United States Code, Section 2.

88.    Based on the facts set forth in this affidavit and upon our experience and training, we also believe that there is probable case to believe that the items listed above to be seized, constitute evidence, instrumentalities and fruits of the criminal offenses set forth above, and that such items are contained in the locations to be searched, as described herein.

44

89. Further, because of the ongoing nature of the investigation, and to ensure the safety of the victims, confidential sources and law enforcement officers involved, we request that the complaint, arrest warrants and search warrants, and application and affidavit in support thereof, be SEALED until further order of this Court.

EXHIBIT A



**ROMERO RUGERIO, SAUL     DOB**: 03/30/78

**DESCRIPTION:**  Hispanic male, 5'6"-5'7", 300-400 lbs

**EXHIBIT B**



**ROMERO RUGERIO, MIGUEL**          **DOB:** Unknown

**DESCRIPTION:** Hispanic male, 5'8"-5'9", 230-250 lbs, 30-35yo

**EXHIBIT C**



**LNU, Alondra (Poss. Real name "Christina") DOB:**Unknown

**DESCRIPTION:** White Hispanic Female, constantly changes her hair color (blonde, Reddish, etc.), 5'6" to 5'7", approx 130-145lbs.